**O'Neal MASSEY, Relator,**

v.

**H. E. MOORE, Warden, Texas State Penitentiary at Huntsville, Texas, Respondent.**

**Civ. A. No. 7077.**

United States District Court
S. D. Texas, Houston Division.

July 29, 1955.

**32**

———◆———

Melvin A. Dow and Jerry M. Hamovit, Houston, Tex., for relator.

John Ben Shepherd, Atty. Gen., of Texas, Will D. Davis, Asst. Atty. Gen., of Texas, and J. Fred Jones Asst. Atty. Gen., of Texas, for respondent.

INGRAHAM, District Judge.

Relator filed his petition, pro se, for writ of habeas corpus in 1952 claiming in substance that he is illegally and unlawfully restrained of his liberty at the State Penitentiary, Huntsville, Texas, in that the judgment of conviction of the District Court of San Jacinto County, Texas, on March 11, 1941, is void for the reason that the Court was without jurisdiction, and making a reference therein to "the question of insanity". In 1952 the District Court denied the petition. The Court of Appeals affirmed by divided vote, 5 Cir., 205 F.2d 665. The Supreme Court in Massey v. Moore, 348 U.S. 105, 75 S.Ct. 145, 146, reversed and remanded to the District Court for further proceedings in conformity with its opinion.

In obedience to the mandate of the Supreme Court the petition was heard by me on July 25, 26 and 27, 1955. I directed and authorized relator to file an amended petition in which he more fully states his claim that his conviction and sentence to life imprisonment imposed by the District Court of San Jacinto County on March 11, 1941, for robbery by assault and under the habitual criminal statute, Vernon's Ann.P.C.Tex. arts. 61–64, are void for the several reasons set out herein, inter alia, that he was insane at the time of trial and was immune from trial while in such condition. It is upon this question that the Supreme Court directs that this hearing be conducted. "We disagree with the Court of Appeals and conclude that petitioner is entitled to a hearing upon the question of whether he was insane at the time of the trial."

We accordingly directed our inquiry to the conduct of the trial in San Jacinto County in 1941, as well as the mental condition of relator at that time. We heard the testimony of Honorable W. B. Browder, judge of the court, Miss Lucy McMurrey, court clerk, Honorable W. C. McClain, the district attorney who prosecuted Massey, Sheriff J. C. Hogue, who had him in custody in the court room, Mr. H. S. Lilley, an attorney of Cold Springs, the county seat of San Jacinto County, and T. D. Stanford, the court reporter who reported the trial. From their uncontroverted testimony it appears that Massey was charged by indictment as above stated. When Massey was brought on for trial he had no attorney of his own selection and Judge Browder appointed Mr. H. S. Lilley to defend the case on behalf of defendant Massey. Massey declined the services of Mr. Lilley. Mr. Lilley testified that he remained in the court room throughout the trial although he did not assist in the defense of Massey. There is testimony that Massey appeared to be stubborn and obstinate, but otherwise they observed nothing unusual in his conduct or appearance. Judge Browder observed that his speech was coherent. The question of insanity, condition of unsound mind or capacity to plead to the indictment and stand trial was not in any way raised or suggested. From matters apparent to the District Court of San Jacinto County there was no denial by it of due process of law.

But the scope of this inquiry goes to those matters not apparent to and not raised before the District Court of San Jacinto County. Relator now asserts that he was insane at the time he was tried in 1941. Among those who testified in his behalf were nine fellow inmates and two former inmates of the Texas Prison System. The testimony of

most of them is meager and inconclusive. Most of them testified to matters and conduct which, considered by themselves, were things which could well have been done by sane and normal persons. But the aggregate of the things done by Massey are claimed to be evidence of the unusual, the unsound mind.

The witness Cade, who was indicted separately but for the same offense as Massey, and as an habitual criminal, testified that while he accepted the proposition of the District Attorney to plead quilty and accept the minimum sentence, five years, Massey would not accept such proposition and went to trial without counsel or assistance of any kind for an offense which carried a mandatory life sentence. This is claimed to be evidence of an unsound mind. It appears imprudent. Cade also testified that while they were awaiting trial that Massey told him that Dr. Hanson's (prison physician) wife was coming to make bond for him and that Judy Garland, the actress, was coming to make his bond, and that following the trial Massey cut his wrists with a razor blade.

The witness Padgett testified that during early 1941 while he was an inmate nurse in the psychopathic ward of the prison hospital (Dr. Hanson testified that Padgett was never a nurse in the psychopathic ward but that he may have volunteered to help while a patient) that he had seen Massey refuse to eat his food, that he had seen him throw his food against the wall, and on one occasion had thrown his food at Padgett; that although he had known Massey, and Massey him, Massey at times would not recognize him; that Massey would fight Negro porters. Padgett testified that later (late 1941 and 1942) at Wynne Farm (one of the farms of the Texas Prison System) Warden Bond had told him that Massey would be released from the psychopathic ward and sent to Wynne Farm and asked Padgett to observe and report on Massey's mental condition. Padgett testified that there were times at Wynne Farm when Massey would not eat, and told Padgett that he got his food from "little men".

Captain Joe Bird, an employee of the Texas Prison System for eighteen years and an assistant warden since 1941, testified that there were times when Massey was like a wild man and times when he was normal. He saw Massey strike Lee Allen, a prison guard. He testified that he once took Massey's father to visit him and that Massey said "I don't want to see the S.O.B." Massey later denied to Captain Bird that he had any recollection of it.

Other matters testified to and claimed to be unusual conduct and evidence of an unsound mind were that Massey stabbed Dr. Hanson in the back, that he tore up his bedding and set it afire, would paste paper on the backs of cockroaches, slept with his clothing and shoes on, would scream like Tarzan at night, would frequently stare into space when people were talking with him and appear not to hear them at all, entertain such delusions as that one of the prison guards was going to kill him and that his fellow inmates were going to knife him, that he was being used as a radio antenna for a bread truck, and that he was at times incoherent and sulky.

We have the benefit of two expert witnesses. One of them is Dr. Grady E. Carson, an educational psychologist now employed by the Houston Public School System as a counselor-teacher. His previous experience is that of counselor for the Gatesville Boys Reformatory, staff psychologist for the San Antonio Hospital for the Insane, and counselor and clinical psychologist for the Texas Prison System. While with the Texas Prison System at Huntsville (1951–1953) he made a case study of a number of inmates, including Massey, upon which he wrote his thesis for his doctorate in educational psychology. He testified that Massey is considered a trouble maker, is defiant. He concludes that Massey is a psychopathic personality, a paranoid schizophrenic, that he is not a normal person, that he is unsound to some de-

gree. In answer to a review of the symptoms and events supported by evidence in the record to have existed or occurred between 1940 and 1942, he concluded that Massey was "not a normal individual" in 1940 and 1941. He further testified that his observation of Massey from 1951 to 1953 indicates no change in his condition.

Our other expert witness is Dr. Abe Hauser, a medical doctor with specialized qualifications in psychiatry and neurology. He possesses outstanding qualifications and experience in his field. He received a degree in medicine in 1927, was adjunct professor of neurology and psychiatry at the University of Texas Medical School from 1928 to 1935. During that period he took special training in neurology at the New York Neurological Institute in 1928, Manhattan State Hospital in 1929, Colorado Psychiatric Hospital in 1930, graduate work at the University of Vienna in 1931. In 1936 he was certified by the American Board of Psychiatry and Neurology to specialize in that field. From 1936 to 1942 he engaged in private practice of psychiatry and neurology and during such period served as consultant to the Texas Prison System in psychiatry. From 1942 to 1945 he served with the Medical Corps, Army Air Corps, as Chief of Neurology and Psychiatry in a Station Hospital and in a Regional Hospital of the Air Corps during the war. He is now on the staff of the Baylor Medical School as clinical professor of neurology and psychiatry. During the period from 1936 to 1942 while Dr. Hauser was consultant to the Texas Prison System in psychiatry, he examined Massey on two occasions, but testified that he had no independent recollection thereof. He testified solely from memoranda of two interviews conducted by Dr. Hauser of Massey on January 26, 1941 and February 23, 1941. The full drafts of such memoranda are attached. See infra p. 35. The report of the first interview is stated to be a superficial examination and the tentative impressions are stated to be (1) without psychosis, and (2) psy-

chopathic personality. The report of the second examination (16 days before the trial) evidences a more complete examination and contains such comments as "abnormal behavior". "His mannerism and facial expression was that of a potential psychotic patient", and the doctor closes with the impression "Subject is a psychopathic personality with potential psychosis. He should be kept under continued observation and treated symptomatically."

The latest pronouncement we have on the test of insanity is the opinion in the case of Durham v. United States, D.C.Cir., 214 F.2d 862, 876. The test laid down in that case is

"simply whether the accused acted because of a mental disorder, and not whether he displayed particular symptoms which medical science has long recognized do not necessarily, or even typically, accompany even the most serious mental disorder."

But we are not trying Massey for crime. We are inquiring into his state of sanity at the time of trial March 11, 1941. He committed no crime on that day. We are to look into his actions on March 11, 1941, and consider them in the light of the evidence of his actions, both before and following, to determine whether he acted as he did because of a mental disorder. What were his actions on that day and on the day preceding? He refused the proposition of the District Attorney to plead guilty and accept a five year sentence. His co-defendant, Cade, under the identical situation accepted the proposition. He declined the services of Mr. H. S. Lilley, the attorney appointed by the Court to defend him, and went to trial without counsel or assistance of any kind, and made no efforts in his own defense, did not question or challenge any of the jurors, did not cross-examine any witnesses and made no statement or argument in his own behalf. Later the same day he slashed his wrists with a razor blade.

The case presented is a complex and difficult one. There are no definite con-

clusions to be drawn from the testimony of any witness and no definite conclusion can be drawn from the single acts of Massey standing alone. The fragments of evidence must be placed together and considered from the viewpoint of how it appears in the composite. It is my opinion that the evidence preponderates in favor of the contentions of the relator that he was insane or of unsound mind at the time of his trial on March 11, 1941, and that he acted as he did on that day because of mental disorder. Being insane, his trial was null and void.

Final decree consistent with this memorandum opinion is filed herewith.

Dr. Hauser
    "Mr. Ellingson's request
90427 Massey, O'Neal—White Male, age 28
Harris County
Robbery—5 Years.
January 26, 1941:—
Interview:  (In-presence of two attendants due to combative attitude of inmate earlier in day)

The subject was in a pouting mood, and seemed to be very upset emotionally. In view of this, it was suggested that he see examiner again on next visit.

The superficial examination made showed no signs of mental disorder, or psychosis. I believe the disturbed behavior was a temperamental reaction.

Tentative Impression:

1. Without psychosis
2. Psychopathic personality.
                /s/ A. Hauser"
            "Request Dr. Hauser on previous interview

"Massey, Oneal, No. 90427—White male age 29—Harris
Robbery by Assault (2)
5 years
Feb. 23, 1941
General Attitude and Behavior:

The subject walked in for examination in a rather reluctant manner. He faced examiner with an unpleasant almost scowling expression. During the entire interview he acted as though he was on the defense, and was ready to become combative with the slightest provocation. His behavior and ideation was otherwise normal. He was not fully cooperative.

Stream of Mental Activity: Normal—speech was coherent and relevant.

Mood and Affect: Subject was slightly morose, almost had the appearance of an angry, dissatisfied individual. He showed no abnormal mood disturbance such as crying or being too cheerful.

Mental Content: The subject was surly and responded to questions sarcastically and indirectly. All the questions seemed to irk him. He expressed the idea that since examiner was a "nut" doctor, it was up to examiner to find out what was wrong with subject—but agreed to answer questions asked. He did not do this however—he evaded or simply did not answer several questions. He requested Dr. Cole to disconnect his testicles—and that would fix him up. He said 'if you had as much pulling and strain as I do, You would want that done too.'

He said he was ready to get going—didn't like staying in the Psychopathic Ward—knew there was nothing wrong with his mind, and could tell that examiner's eyes conveyed the same thought also.

Sensorium: Memory was normal. There were no gross impairments of the sensorium.

Judgment: slightly impaired.

Comment:

The subject showed evidences of abnormal behavior in his general attitude towards the interview. His idea about his gonads was either delusional or an attempt to play a game. His mannerism and facial expression was that of a potentially psychotic patient. The history shows that this behavior is not consistent, that subject flares up and becomes combative and destructive with a whim, and that he has deliberately broken his arm on four occasions. He remains

somewhat uncooperative towards examiner and guards.

Impression:

Subject is a psychopathic personality with potential psychosis. He should be kept under continued observation and treated symptomatically.

A. Hauser"